Thomas ROUMELL, Regional Director of the Seventh Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MIAMI NEWSPAPER PRINTING PRESSMEN LOCAL NO. 46, A SUBORDINATE LOCAL UNION OF I.P.P. N.A.U., AFL-CIO, Respondent.

Civ. A. No. 21575.

United States District Court
E. D. Michigan, S. D.

Oct. 19, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Joseph I. Nachman, Supervising Trial Atty., Washington, D. C., Jerome Brooks,

Regional Atty., Region 7, Detroit, Mich., George Brannick, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

John S. McLellan, Kingsport, Tenn., Donald J. Prebenda, Detroit, Mich., Herbert S. Thatcher, Washington, D. C., for respondent.

Daniel J. Tindall, Jr., Detroit, Mich., for charging party, Knight Newspapers, Inc.

LEVIN, Chief Judge.

Knight Newspapers, Inc., an Ohio corporation and owner of the Detroit Free Press, a daily newspaper published in Detroit, Michigan, charged respondent, Miami Pressmen's Union Local No. 46, with violation of the secondary boycott provision of the National Labor Relations Act, as amended, (29 U.S.C.A. § 158(b) (4) (i) (ii) (B) ) before the National Labor Relations Board. After investigation of the charge, this action for a temporary injunction was brought by the Regional Director of the National Labor Relations Board under Section 10 (*l*) of the labor act (29 U.S.C.A. § 160 (*l*)).

Since August 1, 1961, respondent has been engaged in a labor dispute with the Miami Herald Publishing Company, a Florida corporation, (herein called Miami Herald) which publishes a daily and Sunday newspaper in Miami, Florida. In furtherance of its dispute, respondent, on August 19, 1961, began picketing at the premises of the Detroit Free Press. Respondent admits it has no dispute with the Detroit Free Press and is not certified as the bargaining representative of any of the Detroit Free Press' employees. In consequence of the picketing, the pressroom employees of the Detroit Free Press refused to perform services for it.

The Miami Herald Publishing Company is wholly owned by Knight Newspapers, Inc., which publishes, in addition to the Detroit Free Press, a newspaper in Akron, Ohio. The chief stockholders of Knight Newspapers, Inc. also own both newspapers in Charlotte, North Carolina. Respondent bases its defense to this action on the admitted fact of the common ownership (though in the form of separate corporate entities) of the Detroit and Miami newspapers. The Government contends that, because there is no "common control" of the two newspapers, Knight Newspapers, Inc. is not deprived of the secondary boycott protection of the labor act.

Respondent concedes that the court has jurisdiction of this action, but it made timely challenge to the venue. The pertinent part of Section 10(*l*), 29 U.S.C.A. § 160(*l*), reads as follows:

> "If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. * * * "

The language "within any district where the unfair labor practice in question has occurred" amounts to a special venue provision, and so is an exception to the general venue statute, 28 U.S. C. § 1391(b), which lays venue at the defendant's residence "except as otherwise provided by law." If this language authorized Board action in such districts without laying venue there, it would indeed be a vain grant of power to the Board.

The function and the responsibility of the district court in a Section 10(*l*) proceeding was clearly indicated by Chief Judge Biggs when he set out the NLRB's burden of proof in such proceedings in Schauffler for and on Behalf of N. L. R. B. v. Local 1291, 3 Cir., 1961, 292 F.2d 182 at pages 187–188:

> " * * * Nor need the Board conclusively show the validity of the

propositions of law underlying its charge; *it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous.*

" \* \* \* If, in a Section 10(*l*) proceeding, a district court or a court of appeals undertook to finally adjudicate such questions it would not be acting consistently with the congressional policy underlying Section 10(*l*). That Section's usefulness as a tool with which the status quo may be preserved pending final adjudication would be diminished insofar as the Board would be required to finally litigate questions of substance at a preliminary stage. Moreover, the court would not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision. Thus, the court would, to some extent, usurp the Board's function as the primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme. \* \* \*" (Emphasis added.)

The difficulties involved in reaching coherent interpretations of our labor law are manifest. They ought not to be compounded by requiring the settling of these questions in the context of a hastily called injunction proceeding.

 The rule of law relied upon by the petitioner may be questioned, but, as it certainly cannot be characterized as unsubstantial or "frivolous," it is not for me at this time to pass upon its correctness.

In J. G. Roy & Sons Co. v. N. L. R. B., 1 Cir., 1958, 251 F.2d 771, the court reversed a board finding of "common control," holding that, although common ownership of the primary and secondary employers was admitted, there was insufficient evidence of actual common control of the two companies to warrant denial of secondary boycott protection to the secondary employer. Bachman Machine Co. v. N. L. R. B., 8 Cir., 1959, 266 F.2d 599, followed Roy in reversing an NLRB decision. The court there assumed that the labor policies of the two Bachman-owned corporations were controlled by the same person but ruled this to be insufficient "common control" to warrant considering the two corporations as one employer for purposes of Section 8(b) (4).

The application of the common control criteria to Section 8(b) (4) actions originated in the Roy case. The doctrine was taken from earlier cases in which it was applied to determine the permissible scope of unfair labor practice orders. An example of this use of the common control doctrine is N. L. R. B. v. Condenser Corporation, 3 Cir., 1942, 128 F.2d 67, which was relied on by the court in the Roy case. In Condenser Corporation, the court held that an order directed against both the employer and its parent corporation, finding both guilty of an unfair labor practice, was permissible where there was common control of labor policy.

The common control doctrine has also been applied where the Board's jurisdictional amount requirement has been met by one of two commonly owned employers but not by the other. In this situation, the Board has exercised jurisdiction over both employers where a sufficient degree of common control existed between them. Compare American Furniture Co., 116 NLRB 1496, 39 LRRM 1027 (1956), in which the Board declined to exercise jurisdiction over both employers because there was insufficient common control between them.

The question which was not discussed in Roy or Bachman is whether the common control doctrine can properly be translated to the secondary boycott area. The propriety of making responsibility for unfair labor practices coextensive with actual control of labor policies seems unquestionable. Likewise, it would seem proper to measure the amount of interstate commerce engaged in by a firm in part, at least, by its business relations with its sister firms. But the reason for

allowing the scope of statutory secondary boycott protection to be determined by the way in which one owner chooses to operate two or more ventures is not clear.

Judge Learned Hand, in International Brotherhood of Electrical Workers v. N. L. R. B., 2 Cir., 1950, 181 F.2d 34, 37, affirmed 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, pointed out that: "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute *but upon some third party who has no concern in it.*" (Emphasis added.)

This concept of "neutrality" as a condition for claiming secondary boycott protection under the Act finds support in its legislative history. Senator Taft said, with respect to Section 8(b) (4):

> "This provision makes it unlawful to resort to a secondary boycott to injure the business of a third person *who is wholly unconcerned in the disagreement between employer and his employees.*" 93 Daily Cong.Rec. 4322, April 29, 1947. (Emphasis added.)

In addition, the Court of Appeals, in Truck Drivers and Helpers Local Union No. 728 v. Empire State Express, Inc., 5 Cir., 1961, 293 F.2d 414, 422, 48 LRRM 2702, pointed out that:

> "The requirement that the secondary employer be a 'neutral' is firmly established in the case law."

Respondent cogently argues that the sole owner of the primary employer can hardly be considered "neutral." This is especially true where, as here, the owner is not a mere financial holding company but rather owns the primary employer as part of a chain of similar (newspaper publishing) corporations.

 Nevertheless, as the petitioner's view of this unsettled corner of the law is certainly not without merit, nor "frivolous" or unsubstantial, I must grant the temporary injunction if the evidence adduced indicates that petitioner has reasonable cause to believe that respondent violated the Act, as petitioner interprets it. In the present context this means that I must determine if there is reasonable cause to believe that Miami Herald, the primary employer, and Knight Newspapers, Inc., the secondary employer, are not "commonly controlled," notwithstanding their common ownership.

It is plain that one of the objects of the picketing by members of respondent union was to force the Detriot Free Press to cease doing business with the Miami Herald.

The evidence presented does not support respondent's contention of actual common control, let alone refute the facts which give petitioner "reasonable cause to believe" that an unfair labor practice has been committed.

It is admitted by stipulation that Knight Newspapers, Inc. owns all of the stock of the Miami Herald and that the Board of Directors of the Miami Herald consists of eight members. The Board of Directors of Knight Newspapers, Inc. consists of the eight individuals who are directors of the Miami Herald and six others.

However, the testimony disclosed that there were no business dealings between the two newspapers beyond the usual buying and selling of stories and pictures, which each of the papers also carried on with many other newspapers throughout the country. The testimony of James L. Knight indicates that, as executive vice-president of the Miami Herald for twenty-five years, he has complete and final control over purchasing and labor relations for that newspaper. He has never consulted with, nor received directions from, Knight Newspapers, Inc. relative to labor relations matters of the Miami Herald, nor has he ever made any purchases of supplies essential to the publication of a newspaper through any central purchasing office.

Henry C. Weidler, Business Manager of the Detroit Free Press, testified that he has complete and final authority over purchasing and labor relations for the Free Press and that he alone makes all decisions relative to labor relations matters of the Free Press. For the more

than twenty years that he has been responsible for labor relations, he has never been instructed nor directed by anyone relative to labor relations matters or purchasing for the Free Press. He has never transferred nor been called upon to transfer any employee or supervisor of the Free Press to any other newspaper.

Respondent's main case was an attempt to show that Leslie J. Griner, a vice-president of Knight Newspapers, Inc., was actually the person primarily in charge of labor relations for all Knight-owned newspapers and, in particular, for both the Detroit Free Press and the Miami Herald. Mr. Griner testified that he had participated in labor negotiations for both newspapers here involved, but he explained that he did so only as an observer and technical advisor. One of petitioner's witnesses described him as "a mechanical expert; he is regarded in the nation as the outstanding mechanical leader in the graphic arts trade." Mr. Griner testified that he has been called in as a technical advisor by newspapers other than those in the Knight chain at least ten times, and on at least one occasion he was a technical advisor in contract negotiations for the International Pressmen's Union.

Although the testimony indicates that at times Mr. Griner was delegated authority over broader questions of contract negotiations by the business managers of the respective newspapers, the uncontradicted testimony as to the locus of final authority at each newspaper firmly establishes the lack of common control of labor policies.

Even if central control of labor policies of the primary and secondary employers were established, and it has not been in this case, it is highly doubtful if that would be sufficient "common control" to require that Knight Newspapers, Inc. and Miami Herald be considered as one employer for purposes of Section 8(b) (4). In Bachman, the court *assumed* that the labor relations of both employers were controlled by the individual who was president of both of them and still found that "common control" did not exist.

In the light of all the evidence, I hold that the regional director of the NLRB had reasonable cause to believe that respondent has engaged in an unfair labor practice within the meaning of Section 8(b) (4) (i) (ii) (B) of the National Labor Relations Act, as amended. A temporary injunction pending the final adjudication of the National Labor Relations Board will issue.

An appropriate order may be presented for signature.